HEFFERN, Appellee and Cross–Appellant,

v.

UNIVERSITY OF CINCINNATI HOSPITAL, Appellant and Cross–Appellee.

Riddle, Appellee and Cross–Appellant,

v.

University of Cincinnati Hospital, Appellant and Cross–Appellee.

Russell, Appellee and Cross–Appellant,

v.

University of Cincinnati Hospital, Appellant and Cross–Appellee.

[Cite as *Heffern v. Univ. of Cincinnati Hosp.* (2001), 142 Ohio App.3d 44.]

Court of Appeals of Ohio,
Tenth District, Franklin County.

Nos. 00AP–1060, 00AP–1061 and 00AP–1063.

Decided March 29, 2001.

*John H. Metz,* for appellees.

*Betty D. Montgomery,* Attorney General, and *Larry Y. Chan,* Assistant Attorney General, for appellant.

BOWMAN, Judge.

In these three cases, consolidated for purposes of trial and appeal, defendant, the University of Cincinnati Hospital, and plaintiffs, David Russell, Lori Riddle, and Robert Heffern, cross-appeal from the judgments of the Ohio Court of Claims.

The University of Cincinnati ("UC") operates a medical school and the University of Cincinnati Hospital ("UC Hospital"). In 1991, Heffern, Riddle, and Russell were examined at UC Hospital by a man they knew as Dr. Thomas West. Plaintiffs later learned that West was not a physician. Thomas West was convicted of several crimes related to his examinations and treatment of Heffern, Riddle, and Russell, including impersonating a physician, practicing medicine without a license, and battery. Plaintiffs filed the instant civil lawsuit against UC Hospital. In essence, plaintiffs argue that UC Hospital's negligence provided West with access to the hospital's emergency department and examination rooms, and gave West the opportunity to examine the plaintiffs.

The following evidence was presented during a bench trial in the Court of Claims. West testified that he received a bachelor's degree in biology and applied unsuccessfully to medical school. Although he was never enrolled as a student, in 1986 West started attending classes at the UC medical school. He also read materials from the UC medical school library and tested his knowledge periodically by using computer study programs on the computers in the library. In this fashion, West completed the coursework for the first two years of medical

school. West then attended teaching rounds, where he observed inpatient medical procedures at UC Hospital. Throughout this period, West did not inform any of the instructors that he was not a medical student. Rather, West tried to blend in and pass himself off as a medical student.

From approximately 1987 until 1991, West pretended that he was a physician at UC Hospital. He made efforts to look like a physician. West testified that he took lab coats with embroidered UC insignia from coat racks in the doctors' lounges and wore them in the hospital. West also occasionally wore scrubs, including some that he obtained from locker rooms and changing rooms at UC Hospital. He purchased and wore a stethoscope.

West testified that he never had a UC Hospital identification badge. Rather he had found and altered a non-photographic badge from nearby Providence Hospital, and had obtained a non-photographic badge from nearby Children's Hospital. West testified that he may have worn the Providence Hospital badge while he was at UC Hospital. However, he also testified that there were times that he did not wear an identification badge while he was at UC Hospital, as he considered the white lab coat with the embroidered UC insignia to be adequate identification.

West testified that the UC Hospital staff eventually recognized him and called him Dr. West. He testified that he had received hand-delivered mail at UC Hospital and that he had been paged over the hospital intercom system. Although West could not open certain doors that required a UC Hospital badge swipe, he testified that he obtained access by asking other employees to swipe their own badges or by following others after they opened the doors. West also testified that he was able to get into a locked hallway with plaintiff David Russell because a hospital employee recognized West and buzzed him in.

West testified that, during this four-year period, he basically had access at UC Hospital as would any physician. West stated that he never took any extraordinary measures to avoid the security measures employed at UC Hospital. When he examined the plaintiffs at UC Hospital, he had no difficulty obtaining medical instruments and medicines from treatment rooms. Although he posed as a physician at other hospitals in the Cincinnati area, West testified that he spent about seventy-five percent of his physician-impersonating time at UC Hospital.

During the time that West was posing as a physician, plaintiff David Russell was a police officer for the city of Cincinnati. Russell testified that his beat included UC Hospital and, accordingly, he visited the UC Hospital emergency room on a daily basis. Russell testified that, while he was on duty as a police officer, he saw West in the UC Hospital emergency department between fifty and one hundred times. According to Russell, when West was in the emergency department he was dressed like other doctors in blue hospital scrubs with black

UC lettering and a white lab coat with a red UC emblem. Russell observed that the physicians and nurses at UC Hospital referred to West as Dr. West. Russell testified that he never saw anyone at UC Hospital question West's credentials.

Russell first spoke to West at a Cincinnati-area bar called the Glass Menagerie. Because Russell recognized West from the UC Hospital emergency department, Russell introduced himself. West introduced himself as "Dr. West." Over time, Russell and West became friends. Russell and West were at a restaurant one day when Russell told West that he had a skin lesion on his leg. West suggested that Russell should see a dermatologist. Russell testified that, due to his work schedule, he had difficulty scheduling an appointment with a dermatologist.

When West was at Russell's home one day, West offered to look at the skin lesion. West advised Russell that the lesion was probably nothing to worry about, but he offered to remove it. West and Russell arranged to meet at UC Hospital one day when Russell was not working. Russell testified that they met in the parking lot outside the ambulance entrance to the UC Hospital emergency department. Russell accompanied West into the emergency department. A UC Hospital employee pushed a button to allow Russell and West to gain entry to a hallway that led to an examination room.

Russell testified that West examined the skin lesion, left the examination room, and returned with a product that West called an acid. West applied the product to the lesion and told Russell that it would likely kill the lesion and cause it to fall off. West told Russell that, if the procedure were unsuccessful, West would have to operate to remove the lesion. West bandaged the area, left the examination room, returned with a tube of cream, and advised Russell to apply the cream to the lesion the next day. A couple weeks later, West used a scalpel to remove the lesion. It is undisputed that West performed the second procedure at a different hospital, unaffiliated with UC Hospital.

Russell admitted that he did not register at UC Hospital or fill out any admissions paperwork on the day that West examined and treated his skin lesion. West testified that he did not recall Russell offering to pay for West's services. Russell testified that he told West that he had health insurance that would pay for West's services and offered to fill out insurance forms, but West responded that, since they were friends, Russell would not have to pay. Russell never completed insurance forms, and he never received a bill from West or from UC Hospital.

Plaintiff Lori Riddle was friendly with David Russell. Riddle testified that Russell introduced her to West in April 1991. Riddle began socializing at bars and restaurants with a circle of friends that included Russell and West. On several occasions, Riddle gave West rides to and from various Cincinnati area hospitals and, on two occasions, Riddle allowed West to stay overnight at her

apartment after West reported that he had fought with his girlfriend. Riddle testified that, at some point in April 1991, she told West that she needed a physical examination in order to start a new job. West offered to perform the exam at UC Hospital.

On the day of her examination, Riddle met West in the lobby of a building at the UC medical school. West escorted Riddle through the medical school and through a tunnel that connects the medical school with UC Hospital. Riddle testified that the tunnel was a well-lit and well-traveled corridor. According to Riddle, West was wearing a white lab coat with a UC emblem. She testified that, while they were walking through the corridor, doctors and nurses acknowledged and greeted West. Riddle testified that no one at UC Hospital questioned West's authority or credentials.

Riddle testified that West took her into an examination room and performed a complete physical, including a breast exam, a pelvic exam, and a pap smear. Riddle testified that West told her that she had a lump in her left breast, an ear infection, and a possible ulcer. West used the telephone in the examination room to call in several prescriptions for Riddle at a local pharmacy. West then walked Riddle back through the tunnel and back out the door she had entered at the medical school.

Riddle admitted that she had a family physician at the time West examined her, and that she had previously seen her family physician for annual physicals. She also admitted that she did not register as a patient with UC Hospital or complete any health insurance forms prior to her examination by West. She never received a bill from West or from UC Hospital.

A couple weeks after the examination, West telephoned Riddle and told her that she had chlamydia. According to Riddle, West informed her that she and her boyfriend, plaintiff Robert Heffern, would have to come see West or he would be required to report Riddle's disease to the board of health. Robert Heffern testified that he first heard of West after West diagnosed Riddle with chlamydia. When he heard the news from Riddle, with whom he had been sexually active, Heffern readily agreed to have West examine him. Heffern first met West outside the UC Hospital emergency department, where West told Heffern and Riddle to report for an examination. Heffern testified that West was wearing a white lab coat and a stethoscope. While they were walking through the hospital, they passed employees who neither spoke to them nor questioned West's credentials or authority.

Heffern testified that West led them to an examination room, where he and Riddle were separated by a curtain partition. After West examined Riddle, he asked Heffern to remove his pants. West attached a cotton swab to a stainless steel rod, which he inserted into Heffern's penis. When he finished the proce-

dure, West placed the swab and rod in a test tube. At the time he was examined by West, Heffern had just started a new job and his health insurance benefits had yet to take effect. Heffern testified, however, that he offered to pay for West's services as soon as he had health insurance coverage. Heffern testified that West agreed to wait for the insurance to take effect before he submitted his bill. Heffern admitted that he never received a bill from West or from UC Hospital.

Heffern testified that West informed him on the telephone a couple days latter that Heffern had chlamydia and that Riddle was pregnant. Heffern and Riddle met West at another Cincinnati-area hospital, where West gave them injections of what he described as an antibiotic. It is undisputed that West gave the injections at a different hospital, unaffiliated with UC Hospital. Heffern and Riddle later learned that, contrary to West's diagnoses, they did not have chlamydia and Riddle was not pregnant.

Russell Colling testified on behalf of the plaintiffs as an expert on hospital security. Colling testified that UC Hospital breached the standard of care with regard to its identification system for staff and its access control to its facilities. David Sells, who testified on behalf of UC Hospital as an expert on hospital security, opined that UC Hospital met the standard of care to guard against the risk of physician imposters.

The Court of Claims concluded that the plaintiffs were UC Hospital's business invitees. It concluded that UC Hospital breached a duty of ordinary care owed to the plaintiffs because hospital staff were negligent in implementing security policies and procedures. The court further determined that the plaintiffs were also negligent in selecting to have medical services performed by West. The court concluded that UC Hospital's negligence caused sixty percent of the plaintiffs' damages, while the plaintiffs' own negligence caused forty percent of their damages. The Court of Claims awarded $200,000 in total damages to Riddle, $125,000 in total damages to Russell, and $100,000 in total damages to Heffern. In light of the plaintiffs' contributory negligence, the Court of Claims reduced each of the awards by forty percent.

On appeal, UC Hospital raises the following assignments of error:

"1. The Court of Claims erred as matter of law in finding the University of Cincinnati (UC) liable for the independent criminal acts of Thomas West, who unlawfully performed medical procedures on appellees at the university of Cincinnati Hospital (UCH) and elsewhere.

"2. The Court of Claims erred as a matter of law in finding that UCH failed to exercise reasonable care in implementing its security policies.

3. The Court of Claims erred as a matter of law in finding that the risk posed by physician imposters to individuals who failed to properly register as patients with UCH, announce their presence to UCH admissions personnel, sign consent forms as patients for medical treatment by UCH and who made their personal acquaintance with the physician imposter in drinking establishments and other social settings outside UCH, was reasonably foreseeable.

"4. The Court of Claims erred as a matter of law in finding appellees to be business invitees of UCH.

"5. The Court of Claims erred as a matter of law in admitting testimony concerning criminal acts of Thomas West toward appellees which took place at other hospitals.

"6. The Court of Claims' decision[s] on liability and damages are against the manifest weight of the evidence where a number of key facts established by the evidence are either mischaracterized by the court's findings or are not supportive of the court's findings, and where appellees' admissions conclusively establish facts which negate a finding of proximate cause and liability.

"7. The Court of Claims' damage award fails to take into account the sum of appellees' collateral sources of recovery."

In their cross-appeal, plaintiffs assert the following assignment of error:

"The trial court erred to the prejudice of cross–appellants in finding plaintiffs were contributor[il]y negligent under the circumstances of this case."

■ The appropriate standard of review in this case is whether the decision of the Court of Claims is contrary to law. We will not disturb the judgment of the trial court if it is "supported by some competent, credible evidence going to all the essential elements of the case." *C.E. Morris Co. v. Foley Constr. Co.* (1978), 54 Ohio St.2d 279, 8 O.O.3d 261, 376 N.E.2d 578, syllabus. " 'If the evidence is susceptible of more than one construction, the reviewing court is bound to give it that interpretation which is consistent with the verdict and judgment.' " *Estate of Barbieri v. Evans* (1998), 127 Ohio App.3d 207, 211, 711 N.E.2d 1101, 1103, quoting 5 Ohio Jurisprudence 3d (1978) 192, Appellate Review, Section 603.

We address UC Hospital's fourth assignment of error, as it is depositive of this appeal. We conclude that the Court of Claims erred as a matter of law when it determined that plaintiffs were UC Hospital's invitees and imposed on UC Hospital a duty to exercise ordinary care to protect plaintiffs from injury.

■ To succeed in an action for negligence, a plaintiff must show the existence of a duty of care, a breach of the duty, and an injury to the plaintiff, which was proximately caused by the breach. *Menifee v. Ohio Welding Prod-*

*ucts, Inc.* (1984), 15 Ohio St.3d 75, 77, 15 OBR 179, 180–181, 472 N.E.2d 707, 710. The status of the person injured by a third party on an owner's premises determines the scope and extent of the owner's duty to the injured person. *Gladon v. Greater Cleveland Regional Transit Auth.* (1996), 75 Ohio St.3d 312, 315, 662 N.E.2d 287, 291–292. Under Ohio law, an owner's duty of care depends on whether the injured person is an invitee, a licensee, or a trespasser. *Id.*

The distinction between an invitee and a licensee is dependent on whether the guest enters the land for personal benefit or for the benefit of the owner. A guest who enters an owner's premises, with permission or acquiescence, for personal benefit, is a licensee. *Light v. Ohio Univ.* (1986), 28 Ohio St.3d 66, 68, 28 OBR 165, 167–168, 502 N.E.2d 611, 613–614. A guest who enters an owner's premises, with permission, for some purpose that is beneficial to the owner, is an invitee. *Id.* An owner has a duty to exercise ordinary care to protect an invitee. *Id.* In contrast, an owner merely owes a licensee a duty to refrain from wantonly or willfully causing injury. *Id.*

In *Provencher v. Ohio Dept. of Transp.* (1990), 49 Ohio St.3d 265, 266–267, 551 N.E.2d 1257, 1258–1260, the Ohio Supreme Court concluded that the type of benefit conferred by an invitee upon the owner or occupier of land must take *a tangible or economic form.* The *Provencher* court contemplated whether owners owe a duty of ordinary care to "public invitees." The public invitees standard, recognized in a minority of states, dispenses with the requirement that some type of benefit must be conferred on the owner or occupier before a visitor can be considered an invitee. The *Provencher* court rejected the public invitee standard, stating that "[t]he economic (or tangible) benefit test has long been recognized in this court in order to distinguish the status of an invitee from that of a licensee." *Id.* at 266, 551 N.E.2d at 1259. Consequently, in order to prove that he is an invitee, a plaintiff must establish that the premises owner received a tangible or economic benefit from his visit. See *Roesch v. Warren Distrib./Fleet Engineering Research* (Nov. 22, 2000), Cuyahoga App. No. 77121, unreported, 2000 WL 1738353; *McAllister v. Trumbull Properties Co. L.P.* (Feb. 11, 1994), Trumbull App. No. 93–T–4891, unreported, 1994 WL 45277; *Wheeler v. Am. Legion Community Home Co., Inc.* (June 28, 1991), Ashtabula App. No. 90–A–1571, unreported, 1991 WL 116993.

In the instant matter, plaintiffs have offered no evidence that UC Hospital received any tangible benefit from their visits to the facility. None of the plaintiffs registered as patients at UC Hospital or completed any insurance forms. None received a bill from UC Hospital or paid UC Hospital for any services associated with West. Because plaintiffs have offered no evidence that

UC Hospital received a tangible benefit, they have failed to establish their status as invitees.

Plaintiffs argue that West was acting as UC's agent and that his invitation to plaintiffs to come to UC Hospital makes them invitees. We disagree. In *Carpenter v. Columbus Motor Lodge, Inc.* (1990), 67 Ohio App.3d 589, 593–594, 587 N.E.2d 916, 918–920, this court concluded that a guest who did not confer a tangible benefit on an owner was a licensee, and not an invitee, even though the guest was on the property by express invitation from the owner's employee. See, also, *Stoltz v. Delco Homes* (Aug. 7, 1992), Delaware App. No. 92CA–E–04017, 1992 WL 207041, unreported (concluding that an invitation from an owner's agent did not confer invitee status upon the visitor, absent evidence of tangible economic benefit to the owner). Even if West had been an agent of UC, his invitation to plaintiffs would not have transformed them into UC's invitees absent evidence of a tangible benefit to UC.

 Although plaintiffs provided no tangible benefit to UC Hospital, we conclude that the evidence establishes that UC Hospital acquiesced in their presence at the hospital. Plaintiffs were never asked to leave the hospital or treated in any way that would imply that they were unwelcome. On at least one occasion, a UC Hospital employee opened a locked door to allow West and one of the plaintiffs to pass into a restricted area of the facility. Accordingly, we conclude that plaintiffs were UC Hospital's licensees. We therefore remand this matter for determination of whether UC Hospital breached its duty to refrain from wantonly or willfully causing injury to the plaintiffs and for further proceedings consistent with this decision.

For the foregoing reasons, we sustain UC Hospital's fourth assignment of error and reverse the judgments of the Ohio Court of Claims. In light of our disposition of UC Hospital's fourth assignment of error, we overrule as moot UC Hospital's first, second, third, fifth, sixth and seventh assignments of error and plaintiffs' cross-assignment of error. See App.R. 12(A)(1)(c).

*Judgments reversed*
*and causes remanded.*

PEGGY BRYANT, P.J., and BROWN, J., concur.